JEAN POGUE, JOSEPH POGUE, &ast;
and CASSANDRA MONTGOMERY,
   Petitioners,    &ast;
             CASE NO. 7:07-CR- 00028 HL
vs.          &ast;    28 U.S.C. § 2255
             CASE NO. 7:07-CV-90009,10,11 HL
UNITED STATES OF AMERICA, &ast;
   Respondent.     &ast;

## REPORT AND RECOMMENDATION

The above named Petitioners filed identical Motions to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 on August 21, 2007. (R-123, 128, and 133 respectively). The same are before this court for preliminary consideration as required by Rule 4 of the Rules Governing Section 2255 Proceedings For The United States District Courts. On September 28, 2007, Petitioners filed a joint Memorandum Of Law In Support Of Motion To Vacate, Set Aside, Or Correct Sentence Pursuant to 28 U.S.C.§ 2255. Upon examination, the Petitioners' Motions appear to be timely filed and the first such motion filed in this action.

In their Motions and Memorandum, the Petitioners contend that they timely requested that their counsel file a direct appeal of their convictions and sentences and that counsel failed to do so. An evidentiary hearing was held on the factual issues of their claims of ineffective assistance of counsel, particularly their claim that their attorney failed to file a Notice of Appeal when requested to do so.

## Procedural History

Indictment was returned in this Court on May 18, 2005, against Jean Pogue, her husband, Joseph Pogue, and their daughter Cassandra Montgomery. (Doc. 1). The Indictment charged Jean

Pogue with a total of 43 counts of Financial Institution Fraud and Money Laundering in various instances. Joseph Pogue was charged with a total of 31 counts of Financial Institution Fraud and Money Laundering in various instances. Cassandra Montgomery was charged with a total of 28 counts of Financial Institution Fraud and Money Laundering in various instances. Each of these three defendants were charged in Count One of the Indictment with Conspiracy to Commit Financial Institution Fraud and Money Laundering in violation of 18 U. S. C. § 371 i/c/w 18 U. S. C. § 1344 and 18 U. S. C. § 1956(a)(1)(B)(I). A fourth individual was also charged in the conspiracy, but that individual's name was redacted from the record upon dismissal from the case as part of the Petitioner's plea bargain contained in their Plea Agreements which the three named defendants entered into with the Government on April 6, 2006. (Doc. 57, 61, 65). *See* Plea Agreement of Cassandra Montgomery (Doc. 65) at page 7, ¶ (4)(A):

> **The United States further agrees to dismiss with prejudice the indictment as to defendant XXXXXXX at the time Defendants Jean Pogue, Joseph Pogue and Cassandra Montgomery enter their guilty pleas to Count One of the Indictment.** (emphasis in original)

Petitioners Jean Pogue, Joseph Pogue and Cassandra Montgomery did, in fact, enter into full Plea Agreements with the Government on April 6, 2006, as stated above, in which they also entered into identical pleas of guilty to Count One of the Indictment, a Waiver of Appeal, and a Stipulation of Facts regarding the offenses committed. Section (3) of each of the Plea Agreements (Doc. 57 at 3) contained the following recitation:

> **(A) The Defendant is guilty and will knowingly and voluntarily enter a plea of guilty to:**
> ❕ **Count One of the Indictment which charges defendant with Conspiracy to Commit Financial Institution Fraud and Money Laundering in violation of 18 U. S. C. § 371**

2

> > i/c/w 18 U. S. C. § 1344 and 18 U. S. C. § 1956(a)(1)(B)(I).
> - **(B) That Defendant fully understands that Defendant's plea of guilty to Count One as set forth in Subparagraph (A), above, will subject Defendant to the following penalties:**
> - **Count One: a maximum sentence of Five (5) years imprisonment, a maximum fine of Two Hundred Fifty Thousand Dollars, ($250,000.00), or both, <u>and a term of supervised release of three years (3) years,</u>[1] and a mandatory assessment of $100.00.** (bold emphasis in original; underlining emphasis added)

**I.** Each of the Petitioners entered into a Stipulation of Fact with the Government in their Plea Agreement (Doc. 57, 61, 65), in identical language, at Section (7) thereof, as follows:

> [T]he United States Attorney and the Defendant stipulate and agree to the following:
>
> During the time frame of the conspiracy, the defendants had a tacit understanding to misappropriate the funds of the Unified Singers Federal Credit Union. The following facts could be proven by the Government at trial:
>
> Jean Pogue was the manager of the Unified Singers Credit Union, Thomasville, GA., for a period of approximately 15 years from about 1987 until April 2002. The Credit Union had only one other full-time employee, Deborah Gilbert, the niece of Jean Pogue.
>
> Joseph Pogue acted on behalf of the Credit Union in a variety of official capacities. He purported to act as a "community liaison" on behalf of the Credit Union; solicited investors to purchase certificates of deposit and other new accounts; attended and moderated monthly board of directors meetings; presented financial reports to the board of directors concerning the financial status of the Credit Union; and solicited grants from governmental agencies.
>
> Cassandra Montgomery, daughter of Jean and Joseph Pogue, worked for Monroe-Pogue Insurance, a business located in the same single-family dwelling/office as the Credit Union. There was no

---

[1] On recross-examination (Doc. 160 at 120, 121) Ms. Pogue was asked if she recalled entering into a Plea Agreement limiting her right to appeal to only claims of ineffective assistance of counsel and a sentence in excess of the advisory guideline range. Her incredulous answer, belied by the above provision in Section (3), was, "Well, my thought really was that he (Judge Lawson) had, because I was told that we would get five years, including probation, but we got five years and three probation, which would mean eight. So to me, that was different from what I was told that I would get." The Prosecutor asked Ms. Pogue if that was why she wanted to appeal and she answered, "Yes, because I though I'd got more than what I was told I was going to get."

3

physical separation between the office of the Credit Union and of Monroe-Pogue Insurance.

Cassandra Montgomery presented at least nine fraudulent money orders to be cashed at the Bank of Thomas County which were allegedly purchased at the Credit Union. Cassandra Montgomery appropriated the monies to herself, knowing that neither she nor anyone else had paid the Credit Union for the money orders.

In April 2002, the Credit Union was declared insolvent and closed by the National Credit Union Administration (NCUA), a federal institution which regulates and insures the deposits of federal credit unions.

During the conspiracy, Joseph and Jean Pogue, and Cassandra Montgomery all actively participated in, and directly benefitted from a scheme to defraud the Credit Union, to launder the proceeds through various accounts at the Credit Union, and to spend them on themselves.

The defendants' extensive fraud caused the failure of the Credit Union, and led to its closure and liquidation in April 2002. The defendants obtained approximately $300,000 in proceeds from the Credit Union, and caused a total loss of $1.3 million to the NCUA, and ultimately the U.S. taxpayer.

Jean Pogue and Joseph Pogue were the leaders of the conspiracy, and used their positions of trust at the Credit Union to perpetrate the fraud. Cassandra Montgomery also participated in the conspiracy and received monies from the Credit Union under fraudulent pretenses.

*Id.* at 12-13.

II. The Petitioner's all waived their appellate rights in their respective Plea Agreements (Doc. 57, 61, 65) in identical language at Section (3)(H) thereof, as follows:

> [D]efendant by this agreement forever waives any right to appeal or other collateral review of defendant's sentence in any court. However, in the event the District Court imposes a sentence that exceeds the advisory guideline range, then the defendant shall have only the right to pursue a timely appeal directly to the Court of Appeals after the District Court imposes its sentence. In the event that the defendant retains the right to direct appeal, that right is limited to appealing sentencing issues only.

The validity of Petitioner's Plea Agreement, their waiver of appeal, and their waiver of any

conflict of interest regarding their joint representation by one attorney, was determined by the Court at the time of Petitioner's guilty pleas on April 6, 2006. (Doc. 153).

I. First, after extensive explanation of the possibility of a conflict of interest in the joint representation, the Court asked each of the Petitioner's if they understood his explanation to which each of them responded affirmatively, and then the Court asked each of them individually if they waived and gave up any conflict that might exist and agree that Mr. Handfield represent all three of them at one time, to which they each responded affirmatively. *Id.* at 3-6.

**II.** Each of the Petitioners, under oath, assured the District Judge that they understood the charge contained in Count One of the Indictment; that they understood that the range of sentence was a maximum term of imprisonment of five years, a maximum fine of $250,000, **up to three years of supervised release,** and a $100 mandatory assessment fee. *Id.* at 8,9. Under oath, each of the Petitioners assured the District Judge that they had had sufficient time to consult with their attorney and to discuss the case with him; that he had done for them all that they wished him to do as their lawyer; that each of them had discussed the facts of the case and any defenses which they may have had with their attorney; that they had discussed with him their Constitutional rights; and that they were satisfied with his services. *Id.* at 9, 10. The Court then determined, by their sworn affirmative responses, that each of them understood that they did not have to plead guilty; that they could plead not guilty and have a jury trial during which they would be presumed innocent; that the burden of proving their guilt would be upon the Government; that they would have the right to face and cross-examine all of the Government's witnesses; that they would have the right to subpoena witnesses to come to the trial and testify on their behalf; that they could testify for themselves if they elected to do so, but that they could not be compelled to testify; and that they would at all times have the right

to the assistance of an attorney. *Id.* at 11,12,13.

All three defendants assured the court under oath that they had not been threatened or coerced in any way or had anything done in an attempt to force them to enter their guilty pleas to Count One of the Indictment; and that their pleas of guilty were each freely and voluntarily made. *Id.* at 14. The District Court also determined that Mr. and Ms. Pogue held college undergraduate degrees and that Cassandra Montgomery held a Masters Degree. *Id.* at 17. The Court also determined that each of the Petitioners were entering their guilty pleas because they were in fact guilty of the offense to which they were pleading guilty. *Id.* at 18.

III. The District Court had the Government's attorney summarize the lengthy Stipulation of Facts that the Petitioners had agreed to in the Plea Agreement and each of them assured the Court under oath at their guilty plea hearing that what was stipulated was true and truly described their conduct in the case, "*every word of it.*" *Id.* at 18-25.

IV. On August 21, 2008, the Petitioners filed a Motion To Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, claiming that they requested that their attorney file a Notice of Appeal, even in the face to their waiver of appeal contained in their Plea Agreements. For that reason, an evidentiary hearing was held to determine if counsel had failed to file a Notice of Appeal upon timely request of any of the Petitioner's after sentencing, and whether any or all of them were entitled to an out of time appeal. *See Montemoino v. United States,* 68 F. 3d 416, 417 (11th Cir. 1995*).*

At the evidentiary hearing, Mr. Bubsey, Cassandra Montgomery's counsel, suggested to her that they talk about the issue of appeal. (Doc. 160 at 33). He established that she was not immediately taken into custody immediately upon sentencing, but was allowed to self-surrender after

a medical procedure, and then asked her, "When you left the courtroom, did you have a discussion with Mr. Handfield about appeal?" *Id.* Petitioner Montgomery answered, "No, sir." The attorney asked her if she remembered some discussion about filing a notice of appeal or a waiver of appeal, to which she replied affirmatively. He then asked, "Do you know if that was directed to you or to your lawyer or to both of you, were you supposed to consult, or what?" Petitioner Montgomery answered, somewhat less than responsive to the question, "Well, when we were asked – – when I was asked that in the court, when Judge Lawson asked that, he asked if I would like to appeal, I said, yes. He asked Mr. Handfield if he would be our attorney, he said, yes." *Id.* When asked by the court at the hearing, "Is it contained in there (the sentencing transcript, Doc. 155) that you asked the judge or you told the judge that you wanted to appeal your case?", Petitioner Montgomery persisted in her prior assertion and answered, "Yes sir. ... It's in there, yes sir." (Doc. 155 at 65, 66. The question was asked of Petitioner Montgomery, "And is it in there that he asked, as you said earlier, Mr. Handfield too if he would go ahead and stay in the case and appeal it?" Petitioner Montgomery again answered, "Yes, sir," ... adding, "Its also stated in there that Mr. Crane said to the judge that he – – they found no money going to us directly, but he said that directly and it's in the sentence." *Id.* at 65, 66.

Unfortunately, none of the exonerating contentions and positions taken by Petitioner Montgomery at the hearing can be confirmed by any of the records and particularly not the sentencing transcript. Her Attorney was aware of the treacherous line Petitioner Montgomery was taking herself on, and he mitigated the situation on redirect examination, as follows:

> Q. Now, the magistrate just asked you about the sentencing hearing, at the conclusion of which would normally be where we're talking about appealing, right"

7

> A. Yes. Sir.
>
> Q. And I just read it, and I don't see anything in here about you telling the judge you wanted to appeal or you telling Mr. Handfield you wanted to appeal, right there while there's a court reporter there and you in the courtroom. I'm going to ask you now: To the best of your recollection, when did you ask Mr. Handfield to file an appeal? Was it while the judge was still there, or was it sometime afterwards?
>
> A. It was afterwards that I asked Mr. Handfield for the appeal ... No, sir, it's not in here.
>
> Q. But you wanted him to file a notice of appeal for you?
>
> ......
>
> A. I did not talk to ... Mr Handfield, I'm sorry, directly to do that.
>
> Q. Do you remember writing a letter in June of this year to Mr. Handfield?
>
> A. Yes, sir. .... I was asking Mr. Hand field that we wanted to do our appeal or something we can do before the 21st of 2007, August 21st of 2007, because you had a year to send in something, and we could still send in something to try to do our appeal.
>
> Q. And again, we're talking about this appeal right here, the 2255, not the direct appeal, right?
>
> A. Yes, sir.
>
> B. Because you understood, I assume, by June of '07 that 10 days had already passed?
>
> A. Yes, sir.

*Id.* at 68-70. There is no evidence in the record that, after entering their guilty pleas, according to their Plea Agreement and the waiver of appeal contained therein, that any of the Petitioner's made a timely request of their attorney to file a Notice of Appeal. Ms. Pogue testified that she, her husband and daughter, had gone to Miami a couple of times to see Attorney Handfield and probably spent a two to three hours with him and talked to him probably about 45 minutes by phone. (Doc.

8

160 at 106, 107). Ms. Pogue did not mention anything about an appeal or her sentence until the Magistrate Judge asked her about it after her direct and cross examination. The colloquy in that regard between the Magistrate Judge and Ms. Pogues was as follows:

> Q. Now, you haven't said anything about asking Mr. Handfield to appeal the case. That was something your husband and daughter were involved in; you were not?
>
> A. Yes. I mean, when we did it, he called for all of us to appeal the case for us.
>
> Q. To plead the case. But I'm talking now about filing an appeal.
>
> A. File an appeal.
>
> Q. Yes. Mr. Pogue said that that was – – and Ms. Montgomery said that was done later. I think she concluded that it was actually done to get into this court with a 2255 motion – –
>
> A. Yes, sir.
>
> Q. – – for review of the sentence.
>
> A. Yes, sir.
>
> Q. Okay, so you didn't actually ask Mr. Handfield to appeal the case.
>
> A. Yes, I signed .... the letter that was sent to Mr. Handfield.
>
> Q. Okay, that was in June of 2007.
>
> A. Yes, sir.
>
> Q. So that was ... almost a year after the sentencing.
>
> A. Yes, sir.

*Id.* at 115,116

As to the 10 day window in which any one of the Petitioner's could have filed a Notice of

Appeal themselves, Ms. Pogue acknowledged that Judge Lawson had pointed out to all of them that:

> If you decide to appeal your sentence based on one of these exceptions, *you* must file a notice of appeal or request the clerk of court to file a notice of appeal in your behalf within 10 days of judgment being entered in your case. (emphasis added).

(Doc. 16, 19, 32). In Mr. Pogue's case and Ms. Montgomery's, the Court added, "If *you* fail to do that, you will have forever lost your right to appeal." *Id.* At 19, 32. (emphasis added).

**V.** Despite the fact that each of these Petitioner's had sworn in their Plea Agreements to the amount of loss, they all claim in their Motion To Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 that they took nothing and questioned how the Government had concluded that they should be responsible for the 1.2 Million Dollars in restitution. The Assistant United States Attorney ably explained "total loss" to the Court at page 10 of the sentencing transcript (Doc. 155), saying:

> That was the total loss at the time the credit union was shut down. We could not definitely trace that much money going directly into their pockets for their own personal benefit. As in many complex financial cases, once monies are co-mingled, it becomes impossible to sort out where a certain amount of funds came from or where they went to. We know that that was the loss, yet they did not necessarily benefit directly by that amount.

Likewise, the Petitioner's agreed Stipulation of Facts contained in their Plea Agreement stated:

> The defendants' extensive fraud caused the failure of the Credit Union, and led to its closure and liquidation in April 2002. The defendants obtained approximately $300, 000 in proceeds from the Credit Union, and caused a total loss of $1.3 million to the NCUA, and ultimately the U.S. taxpayer.

(Doc. 57 at 13, 61 at 13, 65 at 13). The PSI also contained a calculation pursuant to 18 U. S. C. §

3663A regarding the calculation of restitution.

While all of the Petitioner's place a heavy emphasis on their disagreement with the amount of restitution ordered to be repaid the federal government by the Petitioner's jointly and severally, contending that their attorney should have done more to reduce that amount, the restitution repayment is made mandatory by 18 U. S. C. § 3663A, and there is nothing that their attorney could have done about it at the late date he entered their cases, i.e, after the NCUA had made all of its findings in regard not only to the amounts by which each of the Petitioner's benefitted but also the amount of loss to the Credit Union had the operation been done properly, instead of by fraudulent loans to fictitious persons and persons who never knew that they had outstanding loans with the Credit Union. Additionally, Petitioners decided to plead guilty to limit their exposure and stipulated in Section (7) of the Plea Agreement (Doc. 57, 56, 65) that, "The defendants obtained approximately $300,00 in proceeds from the Credit Union, *and* caused a loss of a total loss of $1.3 million to the NCUA, and ultimately the U.S. taxpayer." Title 18 U. S. C. § 3663A makes restitution mandatory in certain types of cases. 18 U. S. C. § 3663A(a)(1) provides:

> Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to ... or in lieu of, another penalty authorized by law, that the defendant make restitution to the victim of the crime...

Section 3663A(c)(1) provides:

> This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense –
>   (A) this is –
>     (ii) a crime against property under this title, ... including any offense committed by fraud or deceit; ... and
>   (B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

11

The statute above cited mandated that loss in the amount found by NCUA, stipulated in the Plea Agreement, and found by Federal Probation Office be ordered paid as restitution. Moreover, Petitioner's made no objections to the PSI finding, nor to the Plea Agreement, nor to the Court at the time of their guilty plea hearing. Petitioner's belated restitution claim has no merit. Counsel is not ineffective for failing to raise claims "reasonably considered to be without merit." *Alford v. Wainwright,* 725 F. 2d 1282, 1291 (11th Cir.), cert denied, 469 U.S. 956, 105 S. Ct. 355 (1984). Moreover, a waiver of appeal also prohibits a collateral attack on the district court's determination of the amount of loss in the offense. *United States v. Weaver,* 275 F.3d 1320, 1333 (11th Cir. 2001).

Petitioner Montgomery tries to show by hearsay that her father made a request of counsel to appeal their case within the 10 day period by calling counsel's office about four days after sentencing. The record reflects that Petitioner Joseph Pogue testified in that regard per the following colloquy:

> Q. Did you call Mr. Handfield and ask him to file a notice of appeal on your behalf?
>
> A. No, sir.
>
> Q. Okay, so when your daughter testified that you called down there trying to reach him about four days later, that's not accurate?
>
> A. I tried to do it, but I didn't speak to him. ... I spoke to his secretary or assistant. ... I told her that I needed to get Mr. Handfield involved in the sale of the property so that we could pay him the rest of his money, and that was real important. And then, in addition to that, I wanted to see how the appeal was coming along. ... I mean appealing not the case but the sentence.

(Doc. 160 at 90, 91). It should be noted that Petitioner Joseph Pogue never stated that he ever mentioned to Mr. Handfield's secretary anything about an appeal. Even assuming that he did, does not equate probative evidence that he timely requested an appeal in his case. Secondly, four days after

12

the sentence, there would have been no time for any progress on the appeal to have occurred and an inquiry as to how it was coming along would have been frivolous.

Attorney Handfield's recollection of any timely request for an appeal differs from the Petitioner's vague and speculative recollections. A summary of Mr. Handfield's predicament in this matter may be beneficial to an understanding of the lack of merit in Petitioner's entire Motion.

When the original four alleged co-conspirators were indicted in this matter, Attorney Handfield was employed by Party XXXX (whose name has been redacted from the record) to defend that defendant. Mr. Handfield became familiar with the case and at the initial appearance of all four defendants, Mr. Handfield became aware that Mr. and Ms. Pogue and Cassandra Montgomery were not represented. The Court declined to appoint counsel for them as they did not qualify financially. (Doc. 160 at 123). A considerable period of time passed and Mr. Handfield's client was dismissed from the case. The Petitioner's still had not been able to retain counsel and Mr. Handfield recommended several lawyers to them. They were still unable to hire counsel. Mr. Handfield, because of his familiarity with the case, obtained consent of his client, the Court, the Assistant U.S. Attorney, and the Petitioner's and agreed to represent Petitioners in a guilty plea, with the understanding that he would negotiate with the Assistant U.S. Attorney a deal whereby they would plea to Count one only of the 44 Count Indictment and that their sentence would be capped at the statutory 5 years for that offense. *Id.* at 124, 125, 126.

The Petitioners went to Handfield's office in Miami; he tried to explain the evidence against them in the case, which they did not look at[2]; then Handfield explained to them that if they wanted

---

[2] Mr. Pogue testified that, "At the time he asked me about it, because I don't know much about credit unions anyway, it would have been almost silly for me to look at documents that I knew nothing about. (Doc. 160 at 164).

13

him to come into the case, it would be for the purpose of assisting them in entering their pleas of guilty under the conditions negotiated. *Id.* at 126. Handfield stated emphatically there was never a discussion about representing them at trial. *Id.* at 127.

Handfield testified that at no time did any of the Petitioner's state to him that they were factually innocent and that they were pleading to something that they did not do. *Id.* at 130, 131). Although Attorney Handfield argued for probation, the Court sentenced Petitioner's Joseph Pogue and Jean Pogue to 60 months and Cassandra Montgomery to 40 with joint and severable restitution in the amount of 1.3 million dollars. *Id.* at 135, 136.

Attorney Handfield testified that the first time he heard of a request for an appeal was when he received a letter from Cassandra Montgomery, which was almost a year later, which was consistent with Montgomery's testimony that she wrote Handfield a letter in June of 2007, about getting back in court pursuant to a § 2255 Motion. *Id.* at 136. Attorney Handfield testified that the letter "does not mention, refer, or reflect about any understanding or any expectation of a previous appeal that they believe or thought was going to be filed." *Id.* at 140. The actual language of the letter as read was:

> We understand that we did not [?] do a plea – – we understand that we did a plea agreement, however, we notice that we were charged with one point two "m" [assumed to be million] – and not just the items we made our plea agreement on, we feel that this should be a reason to file an appeal, a motion under 28 U. S. C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody."

There is no evidence in the record or evidence developed from the § 2255 hearing that leads to a determination that the Petitioner's ever timely requested of their attorney that he file a Notice of Appeal of their sentence. To the contrary, the Petitioner's got the capped 60 month sentence (or

14

less) which they had bargained for in their Plea Agreement; they do not contend that their guilty plea was not supported by sufficient evidence; and none of the Petitioner's have asserted that they would have gone to trial had their counsel done anything differently.

## Conclusions of Law

[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known, (citation omitted) focusing on the totality of the circumstances. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea agreement and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal. *Thompson v. United States,* (11th Cir. March 20, 2007).

To establish a claim for relief based upon ineffective assistance of counsel, Petitioner must meet the two pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984). (1) Petitioner must show that his counsel's representation was deficient and (2) Petitioner must show that this deficient representation prejudiced Petitioner. *Strickland,* 466 U.S. at 687; see *Baxter v. Thomas,*

15

45 F. 3d 1501, 1512 (11th Cir. 1995). The two-pronged *Strickland* test is applicable to ineffective assistance of counsel claims arising out of the plea process. *Hill v. Lockhart,* 474 U.S. 52, 57, 106 S. Ct. 366 (1985). As applied to the plea situation, the first prong of *Strickland* remains the same: the attorney's conduct must be shown to have fallen outside the range of reasonable conduct. *Hill,* 474 U.S. at 58. Counsel need only provide a client who pleads guilty with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial. *Wofford v. Wainwright,* 748 F. 2d 1505, 1508 (11th Cir. 1984). The second prong of the *Strickland* test focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Hill,* 474 U.S. at 59. In other words, in order to satisfy the prejudice requirement, Petitioner must show that there is a reasonable probability that, but for counsel's errors, Petitioner would not have pleaded guilty and would have insisted on going to trial. *Id.* Most notable again, none of the Petitioner's have suggested that they would have gone to trial had counsel's representation been different than it was.

Petitioner's have failed to carry their burden of proving that counsel's conduct fell outside the scope of that of a reasonable attorney or that their case would have had a different result if counsel had acted otherwise.

**WHEREFORE, IT IS RECOMMENDED** that Petitioner's Motion To Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 be DENIED. Pursuant to 28 U.S.C. § 636 (b)(1), Petitioner may serve and file written objections to this Recommendation with the UNITED STATES DISTRICT JUDGE, WITHIN TEN (10) DAYS after being served with a copy hereof.

SO RECOMMENDED this 15th day of September 2008.

S/G. MALLON FAIRCLOTH